FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIV.

2008 FEB 28  PM 1: 23

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| COLONY INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| PEACHTREE CONSTRUCTION, LTD. | § | 4 - 0 8 C V - 1 3 5 - Y |
| AND TRAVELERS LLOYDS OF | § | |
| TEXAS INSURANCE COMPANY, | § | |
| | § | |
| Defendant | § | |

## ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW, Colony Insurance Company ("Colony"), complaining of Peachtree Construction, Ltd. ("Peachtree"), and Travelers Lloyds of Texas Insurance Company ("Travelers") (collectively, "Defendants"), and files this its Original Complaint for Declaratory Judgment, and in support hereof, respectfully states as follows:

### I.
### NATURE OF SUIT

1.1    This is a declaratory judgment action filed pursuant to 28 U.S.C. §§2201-2202, in order to determine the rights, duties, legal obligations and relations of the parties under separate commercial general liability insurance policies issued by Colony and Travelers concerning claims filed against Peachtree, Travelers' named insured, in an underlying lawsuit arising from the death of Christopher Lee on or about September 15, 2005.

1.2     As an initial matter, Colony does not owe Peachtree a defense as an additional insured under the general liability insurance policy issued to Colony's named insured because Colony's named insured, CrossRoads, is not a party to the underlying lawsuit and Plaintiff alleges no acts of negligence or omissions against CrossRoads or any other person or entity other than Peachtree.

1.3     Moreover, Colony, who has far exceeded its obligations to Peachtree by providing a defense to Peachtree in the underlying lawsuit as an additional insured under a general liability policy issued to Colony's named insured, XRoads, L.P. d/b/a CrossRoads, L.P. ("CrossRoads"), seeks a declaration from this Court concerning the justiciable controversy regarding the "scope of coverage" afforded by the 2001 edition of ISO's standard Additional Insured Endorsement, CG 20 33 10 01, contained in the Colony policy, and additionally that Colony's duty to indemnify Peachtree in the underlying lawsuit, if any, is limited by the language of the Policy's Additional Insured Endorsement, to wit: the extent that Peachtree's liability to Plaintiff in the underlying lawsuit "arises out of" Crossroads' operations performed for Peachtree at the construction site, as determined by all the facts and circumstances developed during the litigation of the underlying lawsuit or fully and finally adjudicated at the trial of the underlying lawsuit.

## II.
## PARTIES

2.1     Plaintiff Colony Insurance Company is a corporation domiciled and incorporated in the Commonwealth of Virginia, is engaged in the business of insurance in the State of Texas, is licensed to do business in Texas by the Texas Department of Insurance, and has its principal place of business in Richmond, Virginia.

2.2     Defendant Peachtree Construction, Ltd. is a Texas corporation that has its principal place of business at 5801 Park Vista Circle, Keller, Texas 76248, and can be served

with process through its registered agent, J. Barry Clark, at 5801 Park Vista Cir., Keller, Texas 76248.

2.3     Defendant Travelers Lloyds of Texas Insurance Company is a Texas corporation engaged in the business of insurance in the State of Texas, is licensed to do business in the State of Texas by the Texas Department of Insurance, has its principal place of business at 1301 East Collins Blvd., Richardson, Texas 75081, and can be served with process through its registered agent, Corporation Service Company, located at 701 Brazos Street, Suite 1050, Austin, Texas 78701-3232.

### III.
### JURISDICTION AND VENUE

3.1     This is an action for declaratory judgment filed pursuant to 28 U.S.C. §2201, the Federal Declaratory Judgment Act, and Rule 57 of the Federal Rules of Civil Procedure, for the purpose of determining an actual justiciable controversy between the parties as hereinafter more fully appears.

3.2     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, as the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

3.3     Venue is proper in the Northern District of Texas, Fort Worth Division, by virtue of 28 U.S.C. §1391.

### IV.
### FACTUAL BACKGROUND

4.1     In or around the Spring of 2005 Peachtree, as general contractor, entered into a contract with the Texas Department of Transportation (TXDOT) to re-pave a 10-mile stretch of FM 51 in Weatherford, Parker County, Texas (the "Project"). In or around April 2005,

Peachtree subcontracted with CrossRoads to provide construction signage, barricades and warning devices along the construction site (hereinafter the "Subcontract"). Although, the Peachtree-CrossRoads Subcontract required CrossRoads to maintain primary general liability coverage for the Project and name Peachtree as an additional insured under such policy, the Subcontract's indemnity provision set forth in Article 10 of the contract expressly provided that neither CrossRoads nor Peachtree was required to indemnify the other for the consequences of their own negligence. A true and correct copy of the Peachtree-CrossRoads Subcontract is attached hereto as *Exhibit A.*

4.2   In or around July 2005, Colony issued Commercial General Liability Policy, Policy No. GL3365060, to CrossRoads, as the named insured, for a policy period of July 30, 2005 to July 30, 2006 (hereinafter the "Colony Policy"). A true and correct copy of the Colony Policy is attached hereto as *Exhibit B*. The Colony Policy contains a blanket additional insured endorsement in favor of "Owner, Lessees or Contractors" when required in a construction agreement with CrossRoads; however, the endorsement's language is restricted to "*liability* "arising out of" Colony's ongoing operations performed for the additional insured."

4.3   In or around June 2005, Defendant Travelers issued a Commercial General Liability Policy, Policy No. DT-CO-8825A589-TLC-05 to Peachtree, as the named insured, for a policy period of June 30, 2005 to June 30, 2006 (hereinafter the "Travelers Policy"). A true and correct copy of the Travelers' Policy is attached hereto as *Exhibit C*.

4.4   During a two-week period in July 2005, several months before the re-paving Project commenced, Peachtree, pursuant to its Subcontract with Crossroads, leased numerous construction signage from CrossRoads for placement at the construction site. CrossRoads, in compliance with Peachtree's instructions as approved by TXDOT, placed numerous signage

along the construction zone prior to construction of the re-paving Project. The Peachtree-CrossRoads Subcontract did not require CrossRoads to be physically present at the site during the construction Project and, in fact, prior to the accident giving rise to the underlying lawsuit, no CrossRoads employee or representative was physically present at the site after September 8, 2005.

4.5     On the morning of September 15, 2005, Plaintiff Lee, a third party member of the public who had no relationship—employment or otherwise—with any construction entity or contractor involved in the FM 51 re-paving Project, was traveling south through the construction zone on his way to work operating a 2002 Suzuki 800cc motorcycle when he suddenly lost control of his motorcycle and crashed. Lee was ejected from the motorcycle and died as a result of his injuries. Lee's surviving widow subsequently instituted a wrongful death suit against Peachtree for negligence and gross negligence in causing her husband's death, styled *Kari Lee, Individually and as Next Friend of Christopher Lee v. Peachtree Construction, Ltd.*, Cause No. 153-216712-06, in the 153rd Judicial Court of Tarrant County, Texas (hereinafter the "underlying lawsuit"). Again, at the time of his death, Lee was a traveling motorist enroute to work and was not employed in any capacity with the FM 51 Project. CrossRoads is not a party to the underlying lawsuit and Plaintiff alleges no acts of negligence or omissions against CrossRoads or any other person or entity other than Peachtree. A true and correct copy of the underlying lawsuit is attached hereto as ***Exhibit D***.

4.6     In or around April 2006, Travelers, Peachtree's general liability insurer, tendered Peachtree's defense to Colony pursuant to the Policy's blanket additional insured endorsement, claiming that Peachtree qualified as an additional insured under the Colony Policy for the subject accident. Colony, acting in good faith, accepted Travelers' defense tender.

4.7     Since June, 2005, even though Colony's duty to defend and duty to indemnify Peachtree in the underlying lawsuit are questionable, Colony has been providing a full defense to Peachtree in the underlying lawsuit pursuant to a reservation of rights and has paid all of Peachtree's litigation costs in its defense of the underlying suit.  On the other hand, Travelers has refused to contribute or share in Peachtree's defense.

## V.
## RELEVANT PROVISIONS OF THE POLICY

### *The Colony Policy*

5.1     The Colony Policy provides liability coverage to CrossRoads for a policy period of July 3, 2005 to July 30, 2006 and provides liability limits of $1 million.

5.2     The Colony Policy is a standard "occurrence" based CGL Policy.  The "Insuring Agreement" of Coverage A of the Policy (Bodily Injury and Property Damage Liability) provides, in pertinent part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any said "occurrence" and settle any claim or "suit" that may result....

**(*Exhibit B*)**

The insurance applies to "bodily injury" and "property damage" caused by an "occurrence" during the policy period.  *Id.*  An "occurrence" is defined in the Policy as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."  "Bodily injury" is defined in the Policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

5.3     The Policy also contains a blanket additional insured endorsement for "Owners, Lessees or Contractors", as follows:

### ADDITIONAL INSURED — OWNERS, LESSEES OR CONTRACTORS —AUTOMATIC STATUS WHEN REQUIRED IN CONSTRUCTION AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.     **Section II – Who Is An Insured** is amended to include as an insured any person or organization *for whom you are performing operations* when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. ***Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured.*** ***A person's or organization's status as an insured under this endorsement ends when your operations for that insured are completed.***

B.     With respect to the insurance afforded to these additional insureds, the following additional exclusions apply:

   2.     **Exclusions**

   This insurance does not apply to:

   a.     "Bodily injury", "property damage" or "personal and advertising injury" arising out of, the rendering of, or the failure to render, any professional architectural, engineering or surveying services, including:

      (1)     The preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

      (2)     Supervisory, inspection, architectural or engineering activities.

   b.     "Bodily injury" or "property damage" occurring after:

      (1)     All work, including materials, parts or equipment furnished in connection with such work, on the

project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or

**(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

(***Exhibit B***; CG 20 33 10 01)

### *The Travelers Policy*

5.4     The Travelers Policy provides primary liability coverage to Peachtree for a policy period of June 30, 2005 to June 30, 2006 and provides liability limits of $1 million for each occurrence.

5.5     The Travelers Policy, like the Colony Policy, is a standard "occurrence" based policy and the Policy's "Insuring Agreement" tracks the language of the Colony Policy. The "Insuring Agreement" of Coverage A of the Policy (Bodily Injury and Property Damage Liability) provides, in pertinent part:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any said "occurrence" and settle any claim or "suit" that may result....

(***Exhibit C***)

The insurance applies to "bodily injury" and "property damage" caused by an "occurrence" during the policy period. *Id.* An "occurrence" is defined in the Policy as an "accident, including continuous or repeated exposure to substantially the same general harmful

**ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT – PAGE 8**

conditions." "Bodily injury" is defined in the Policy as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."

### The Policies Other Insurance Clauses

5.6     The "Other Insurance" clauses of both the Colony Policy and Travelers Policy are identical. These clauses provide as follows:

**4.      Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.       Primary Insurance**

This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.       Excess Insurance**

This insurance is excess over:

(1)      Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a)      That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b)      That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c)      That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d)      If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury and Property Damage Liability.

(2)    Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, <u>that exceeds the sum of</u>:*

(1)    *The total amount that all such other insurance would pay for the loss in the absence of this insurance; and*

(2)    *The total of all deductible and self-insured amounts under all that other insurance.*

*We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.*

c.    **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(***Exhibit B***; CG 00010798, p. 10) (***Exhibit C***; CG 00011001, pp. 11-12)

# VI.
## CLAIM FOR DECLARATORY RELIEF

6.1     There exists an actual and justiciable controversy between Colony and Defendants herein within the jurisdiction of this Court involving the rights, duties, legal obligations and relations of the parties under the Policies, which controversy may be determined by declaratory judgment, without other suits.

6.2     Pursuant to 28 U.S.C. §2201, Colony seeks a declaration from this Court that there is no coverage under the Colony Policy for the defense or indemnity of Peachtree in the underlying lawsuit because Colony's named insured, CrossRoads, is not a party to the suit and the underlying Plaintiff alleges no acts of negligence or omissions against CrossRoads or any other person or entity other than Peachtree.

6.3     Additionally, Colony seeks a declaration that assuming Colony owes Peachtree a defense in the underlying lawsuit, Colony's indemnity obligations to Peachtree, if any, are limited because the Additional Insured Endorsement of the Colony Policy affords coverage for Peachtree's liability to Plaintiff in the underlying lawsuit only with respect to Peachtree's liability "arising out of" CrossRoads' ongoing operations performed for Peachtree.

6.4     Additionally, Colony seeks a declaration that the Additional Insured Endorsement of the Colony Policy does not obligate Colony to indemnify Peachtree for its liability to Plaintiff if such liability is determined not to arise out of CrossRoads' ongoing operations performed for Peachtree at the Project.

6.5     Additionally, Colony seeks a declaration that the Additional Insured Endorsement of the Colony Policy obligates Colony to indemnify Peachtree for its liability to Plaintiff only to the extent such liability is determined to arise out of CrossRoads' ongoing operations for Peachtree at the Project.

6.6    Colony also seeks a declaration that it does not owe Peachtree a duty to indemnify in the underlying lawsuit for Peachtree's liability to Plaintiff that does not arise out CrossRoads' ongoing operations for Peachtree and that is attributable to Peachtree's own tortious acts or omissions as may be adjudicated at trial of the underlying lawsuit.

6.7    Colony also seeks a declaration that Travelers owes Peachtree, its named insured, a duty to indemnify Peachtree in the underlying lawsuit for its share of any and all of Peachtree's liability to Plaintiff for any amount that exceeds the total amount Colony is adjudged obligated to pay, namely, that amount determined not to arise out of Crossroads' ongoing operations performed for Peachtree as may be adjudicated at trial.

6.8    All conditions precedent for Colony to recover said requested declaratory relief have been performed or has occurred.

## VII.
## PRAYER

WHEREFORE, Plaintiff Colony Insurance Company prays that Defendants be cited to and answer herein, and that on final hearing, Colony have judgment as follows:

(a)    A declaration of the rights, duties, legal obligations and relations of Colony, Peachtree, and Travelers under the Policies;

(b)    A declaration that there is no coverage under the Colony Policy for the defense and indemnity of Peachtree in the underlying lawsuit;

(c)    A declaration that Travelers, as Peachtree's primary liability carrier, owes Peachtree a primary duty to defend and primary duty to indemnify Peachtree in the underlying lawsuit;

(d)    A declaration that the scope of the coverage afforded by the Additional Insured Endorsement of the Colony Policy is limited to Peachtree's liability to Plaintiff "arising out of" CrossRoads' ongoing operations performed for Peachtree;

(e)    A declaration that the scope of coverage afforded by the Additional Insured Endorsement under the Colony Policy does not obligate Colony to indemnify

Peachtree for its liability to Plaintiff if such liability is determined not to arise out of CrossRoads' ongoing operations performed for Peachtree;

(f) A declaration that Colony's duty to indemnify Peachtree, if any, for its liability to Plaintiff in the underlying lawsuit is restricted to Peachtree's liability "arising out of" CrossRoads' ongoing operations for Peachtree at the Project;

(g) A declaration that Colony does not owe Peachtree a duty to indemnify Peachtree in the underlying lawsuit for Peachtree's liability to Plaintiff that does not arise out of CrossRoads' ongoing operations for Peachtree and that is attributable to Peachtree's own tortious acts or omissions as may be adjudicated at trial of the underlying lawsuit;

(h) A declaration that Travelers owes Peachtree, its named insured, a duty to indemnify Peachtree in the underlying lawsuit for its share of any and all of Peachtree's tort liability to Plaintiff that exceeds the total amount that Colony is adjudged obligated to pay that does not to arise out of Crossroads' ongoing operations performed for Peachtree and that is attributable to Peachtree's own tortious acts or omissions as my be adjudicated at trial of the underlying lawsuit; and

(i) A declaration for such other and further relief to which Colony may be justly entitled and/or this Court deems just and appropriate.

Respectfully submitted,

**FEE, SMITH, SHARP & VITULLO, L.L.P.**

**DAVID C. COLLEY**
State Bar No. 04583600
Three Galleria Tower
13155 Noel Road, Suite 1000
Dallas, Texas  75240
972/934-9100  phone
972/934-9200  fax

**ATTORNEYS FOR PLAINTIFF**
**COLONY INSURANCE COMPANY**

# *EXHIBIT A*

# PEACHTREE CONSTRUCTION. LTD.
## SUBCONTRACT AGREEMENT

This subcontract agreement dated April 26, 2005 between PEACHTREE CONSTRUCTION, LTD. ("Contractor") and Cross Roads, L.P. of 7809 N. Beach, Fort Worth, Texas, 76111   Telephone number 817-759-1199 Fax number 817-759-1135 ("Subcontractor"), witnesseth, that in consideration for the mutual covenants contained herein, the parties hereby agree as follows:

**Article 1.** The following terms shall have the following meaning:

(a) The "Owner" is: Texas Department of Transportation

(b) The "Work" is the construction to be performed for Owner. The work has the following project description or number:   FM 51, Parker County Project # CFM 313-7-13 (#2525)

(c) The "General Contractor" is the party with whom the Owner has contracted for the work. The name of the General Contractor, if he is a party other than Contractor as identified above, is (if Contractor is the General Contractor, type "same"): SAME

(d) The "Prime Contract" is the contract between the Owner and General Contractor covering the Work. The term "Prime Contract" includes the plans, specifications, general and special provisions, addenda and all other contract documents which are incorporated into that agreement by its terms. Each party to this agreement acknowledges that he is familiar with the terms of the Prime Contract, and agrees that the Prime Contract (including the contract documents incorporated therein) is incorporated herein in its entirety for all purposes as if copied at length and attached hereto.

**Article 2.** Subcontractor agrees to furnish all labor, materials, tools, equipment, supervision, and other things required to do the following portions of the Work at the prices set forth below, such portions of the Work to be called the "Sublet Work":

**Subcontractors quote is made a part of this agreement with conflicts being interpreted in favor of this agreement. See Exhibit "A"**

**Article 3.** Contractor will pay Subcontractor monthly, in Tarrant County, Texas, based upon the estimate or invoice paid by Owner (or General Contractor, if any) as soon as is practicable after Contractor receives monthly payment, provided that Contractor shall retain a 5% retainage from each partial payment until final payment is due to Subcontractor. Contractor's receipt of each monthly payment from the Owner shall be a condition precedent to any payment being due from Contractor to Subcontractor. It is the express intent of the parties that Subcontractor assumes the risk of non-payment by the Owner. Monthly payments shall not be construed to be acceptance of that portion of the Sublet Work for which payment is being made. The meaning of the provisions of the Prime Contract, (as it may be determined by any final judgement in or good faith settlement of litigation between Owner, Contractor and/or General Contractor, if any) will control with respect to measurement, quantities and payment, including payments for extras, changes, and variations in plans and site conditions. Final payment will be made as soon as is practicable after Contractor receives final payment from the Owner (or General Contractor, if any), and after final acceptance of the work by Owner, provided that if mechanics lien claims or bond claims may be asserted by mechanics, materialmen, suppliers, or subcontractors of Subcontractor more than 30 days after such date, or if claims already have been asserted, then Contractor may withhold final payment until such time has elapsed and/or such claims have been discharged. Contractor's receipt of final payment from the Owner shall be a condition precedent to final payment being due from Contractor to Subcontractor. It is the express intent of the parties that Subcontractor assume the risk of non-payment by the Owner. Contractor may offset against any sums due Subcontractor hereunder the amount of any liquidated or unliquidated obligations of Subcontractor to Contractor, whether or not arising out of this Subcontract. Subcontractor agrees that neither he nor his subcontractors, suppliers or mechanics or anyone claiming under them shall have any lien upon the Sublet Work, or the premises on which the Work is performed, and Subcontractor hereby waives on behalf of himself and his subcontractors, suppliers and mechanics and those claiming under them, all right to any such lien. Subcontractor agrees to indemnify Contractor and Owner against all lien claims and bond claims, including expenses, costs of bonds to remove lien, and attorneys fees related to such claims, which may be asserted by mechanics, materialmen, suppliers or subcontractors of Subcontractor or of his subcontractors and suppliers or anyone claiming under one of them. Subcontractor also agrees that if liens are placed on the Work of the premises on which the Work is performed, he will immediately obtain such bond which is necessary to remove such lien. If bond claims and/or lien claims are filed by any subcontractors, materialmen, suppliers or mechanics of Subcontractor, Contractor may suspend payments to Subcontractor and either hold money due Subcontractor or make payments to the claimants and charge the payments against Subcontractor, without prejudice to the payment bond. It is the intent of the parties that the payment bond be for the benefit of Contractor, Owner and General Contractor, if any, and not for the benefit of third parties except to the extent necessary to protect Contractor, Owner and General Contractor, if any.

**Article 4.** Subcontractor agrees to perform the Sublet Work in a careful and workmanlike manner in accordance with the best construction practices and with this Subcontract, and in strict accordance with the Prime Contract, and to assume and discharge all responsibilities which Contractor (and General Contractor, if any) has assumed under the Prime Contract with respect to the Sublet Work, except as otherwise provided herein, including but not limited to any obligations to provide casualty insurance for the Owner, architect, engineer or others with respect to the Sublet Work. Subcontractor agrees to procure materials and supplies in advance and to provide sufficient men, equipment and supervision to ensure that the Sublet Work will be prosecuted diligently and coordinated with other work at the site and completed within the time allotted and in accordance with the requirements of the Prime Contract. Subcontractor shall be responsible for damage to or loss of the Sublet Work, whether completed or under construction, until responsibility for the Work has been accepted by the Owner, and Subcontractor agrees to indemnify Contractor against all expense and costs caused by any such damage or loss from any cause. Subcontractor will also take reasonable precautions to protect other portions of the Work. Subcontractor will maintain a neat working area and will not permit trash and debris to accumulate unreasonably, and will remove all trash and debris caused by his operations. Subcontractor assumes sole responsibility for the removal and disposal of any and all hazardous or toxic materials provided, encountered, used, or generated by or provided to the subcontractor from the site in strict accordance with the laws, rules, regulations and standards of the Environmental Protection Agency, The Texas Water Commission, The Texas Air Control Board, The Texas Department of Health, as well as the city and county, along with any and all other applicable laws or regulations, as they may be enacted or amended from time to time.

**Article 5.** Subcontractor agrees to be bound by all the provisions of the Prime Contract, including but not limited to provisions relating to quantities, measurement and payment, to change orders, extra work, variations in plans and/or site conditions, time extensions and claims. Contractor agrees that it will present to Owner (or to General Contractor, if any) any claims for payment, time extension or any other item which Subcontractor chooses to submit, provided that Subcontractor agrees to prepare all notices in a proper manner sufficiently in advance of the time for notice to permit Contractor (and General Contractor, if any) to submit the notice, and Subcontractor agrees to prepare the documentation, comply with all other requirements of the Prime Contract, and do all things necessary to enable Contractor to present Subcontractor's claim. Contractor agrees to cooperate with Subcontractor in presenting Subcontractor's claims, and Subcontractor agrees to cooperate with Contractor and all other subcontractors of Contractor in presenting all claims, to the extent that such cooperation is reasonable. Subcontractor may not recover more from Contractor than the amount Contractor recovers from Owner or General Contractor, if any, in his recovery on claims which are essentially claims against the Owner or General Contractor, if any. All extra work and change orders must be authorized in writing and signed by Contractor. Subcontractor will furnish Contractor time sheets, invoices and other substantiating data necessary to satisfy the requirements of Contractor and the Owner. If any part of the Sublet Work depends upon the work of Contractor or of any other subcontractor, Subcontractor shall inspect such other work and promptly report to Contractor any defects or inadequate performance which adversely affects Subcontractor's work. If there appears to be any variations or discrepancies of dimensions, quantities, or other matters set forth in the plans, specifications and other portions of the Prime Contract, Subcontractor will promptly bring the matter to the attention of Contractor in writing. Subcontractor agrees to be bound by the terms of the Prime Contract with respect to such variations. All claims which Subcontractor has or wishes to assert against Contractor must be presented in writing to Contractor not later than 10 days after Subcontractor is aware or should be aware that a claim will or does exist, or such longer time as may be provided by law, even though the exact nature of the claim and the amount of the claim may not be determinable at that time. The nature of the claim and the amount of the claim must be presented to Prime Contractor in writing as soon thereafter as Subcontractor has or should have such information, and Subcontractor hereby waives all claims not presented as provided herein.

**Article 6.** Subcontractor agrees that it will obtain all permits and licenses and pay all fees and charges necessary for the lawful prosecution of the Sublet Work, and that it will comply, at its own expense, with all local, state and federal laws, including but not limited to the Occupational Safety & Health Act of 1970 as amended and the Civil Rights Act of 1964 as amended, including rules and regulations promulgated thereunder, and including Executive Order 11246 and any successor Executive Order modifying or superseding that Order. These provisions are incorporated herein for all purposes. Subcontractor represents and warrants that it is and will remain in compliance with the Immigration Reform Act of 1986 as amended.

**Article 7.** It is agreed that time is of the essence of this Subcontract. Subcontractor agrees to commence work when so directed by Contractor, to prosecute his work in the sequence and on the schedules which Contractor may prepare, in cooperation with the Owner, Contractor and other contractors on the job, to allow the Contractor to complete the Work within the time specified by the owner. The parties agree that if Subcontractor fails to complete his work within such time period then Subcontractor shall pay to Prime Contractor the sum of $250.00 per calendar day for the excess time required for completion, as liquidated damages for its failure to perform. Such payment is not a penalty but is a liquidation of the amount of damages which Contractor will suffer from such failure to perform. If no liquidated damages are specified, Contractor shall be entitled to actual damages, if any.

**Article 8.** If Contractor gives Subcontractor written notice that Subcontractor is not adequately performing any of its obligations hereunder, and Subcontractor fails to correct such deficiencies to the satisfaction of Contractor within 48 hours after notice, Contractor shall have the right at any time after said 48 hours either to supplement the work of Subcontractor or to take over completely the performance of the remainder of the Sublet Work, either with Contractor's own forces or by contract with others. Subcontractor hereby gives Contractor the right to use all or any part of Subcontractor's tools, equipment, machinery, materials and supplies located on the project for the purpose of performing the Sublet Work and agrees to execute any assignments necessary to make available to Contractor and the Owner the rights of Subcontractor under purchase orders and subcontracts. Contractor will credit Subcontractor's account with the value of the materials and supplies so used but there will be no credit for rent on equipment. Subcontractor will reimburse Contractor in Dallas County, Texas to the extent that Contractor's expense including attorneys fees in completing the Sublet Work and proceeding under this paragraph exceeds the balance which would have become due to Subcontractor under this Subcontract had Subcontractor completed the Sublet Work; if

terminate this Subcontract. If this Subcontract _____ minated pursuant to this paragraph, Subcontractor will re_____ e Contractor in Tarrant County, Texas, to the extent that Contractor's expense, including attorneys fees, _____ ompleting the Sublet Work and proceeding under this para_____ph, exceeds the balance which would have become due to Subcontractor under this Subcontract had Subcontractor completed the Sublet Work, after deducting amounts previously paid to Subcontractor. If Contractor's expense is less than such amount, then Contractor will pay the difference to Subcontractor. Regardless whether Contractor elects to terminate this Subcontract or pursue other rights, it is agreed that in all events pending receipt of satisfactory assurance of performance, Contractor shall be entitled to proceed with the Sublet Work with its own forces or with other subcontractors on a time and material or other appropriate basis, the cost of which will be backcharged against the Subcontractor.

**Article 13.** If this Subcontract is signed before Contractor (or General Contractor, if any) is awarded the Prime Contract by the Owner, then it shall constitute a pre-bid agreement which cannot be cancelled by either party, and upon award to Contractor and General Contractor, if any, shall become a binding subcontract. If no such award is made pursuant to the letting of bids for which this agreement was prepared, this agreement shall have no further effect.

**Article 14.** It is understood that Subcontractor is an independent contractor and that Contractor shall have no right to direct the operation or employees of Subcontractor. Subcontractor agrees to maintain a familiarity with conditions existing over the entire premises on which the Work is located so that he will be aware of dangerous conditions, whether obvious or hidden, and Subcontractor agrees to warn its employees, subcontractors and suppliers of unsafe conditions on the premise.

**Article 15.** It is agreed that the Subcontractor may not assign this Subcontract or any portion thereof, or any payment due under this Subcontract without written permission from Contractor.

**Article 16.** Any waiver or failure to assert any right which either party has under this Subcontract shall not constitute a continuing waiver of future rights. Rights can be waived only if expressed in writing signed by an officer of the waiving party. If any provision of this agreement is held invalid or unenforceable under any present or future laws, then the remainder of the agreement shall remain in effect.

**Article 17.** This Subcontract contains the entire agreement of the parties and may not be altered by prior or contemporaneous written or oral statements or representations, and may be amended only by written instrument signed by both parties. Subcontractor certifies that he is familiar with the physical conditions at the site, the availability of labor and materials, and the requirements of the Prime Contract.

**Article 18.** Checklist (Attached Special Provisions)

**WITNESS OUR HANDS this** ___30___ **day of** ___April___ ___,20_05__.

CONTRACTOR: PEACHTREE CONSTRUCTION, LTD.     SUBCONTRACTOR: Cross Roads, L.P.

By: Peachtree International, L.L.C., General Partner

By: _____     By: _____
J. Barry Clark, President     Printed Name: ___MARC LEWIS___

Date: April 26, 2005     Title: ___PARTNER___

Contractor's expense is less than such amount. Contractor will pay the difference to Subcontractor. Subcontractor hereby waives all claims against Contractor for profits, rent on equipment or other damages related to proceeding which Contractor institutes under this paragraph. the parties agree that the terms of this paragraph shall be binding if Contractor in good faith has made a reasonable determination that Subcontractor's performance is inadequate and that the Owner or Contractor or other subcontractors may be significantly damaged, or Contractor may be unable to perform its contractual obligations, unless Contractor proceeds under this paragraph; the parties agree that such determinations are difficult to make and must be made under pressing circumstances, and agree to be bound in accordance with this paragraph and in light of the circumstances confronting Contractor at the time such a decision is made.

## Article 9.
In addition to any other insurance which Subcontractor may be required to carry, Subcontractor shall maintain, in effect the following insurance at Subcontractor's sole expense, in insurance companies acceptable to Contractor and shall furnish Contractor with certificates evidencing such insurance outlined on the Certificate of Insurance form, which policies shall be endorsed to state that insurance cannot be cancelled and restrictive modifications cannot be made without giving 30 days prior written notice to Contractor. Subcontractor's policies shall be primary over any other insurance carried separately by Contractor and Owner.

| | Statutory Limits | |
|---|---|---|
| **Worker's Compensation and Employer's Liability Insurance** (shall waive Carrier's right to subrogation against Owner and Contractor) | Each Accident | $500,000 |
| | Disease - Policy Limit | $500,000 |
| | Disease - Each Employee | $500,000 |
| **Comprehensive General Liability** (including contractual liability coverage for obligations assumed under this contract, and completed operations/products, Owner and Contractor as Additional Insureds, Broad Form Property Damage, Blasting, Collapse and Underground Coverages, Owners and Contractors Protective coverage, and waivers of subrogation against Owner and Contractor) | General Aggregate | $1,000,000 |
| | Products - Completed Operation | $1,000,000 |
| | Personal & Adv. Injury | $1,000,000 |
| | Each Occurrence | $1,000,000 |
| | Medical Expense | $1,000,000 |
| **Comprehensive Automobile Liability** | Bodily Injury + Property Damage | $1,000,000 |
| | Bodily Injury (per person) | $1,000,000 |
| | Bodily Injury (per accident) | $1,000,000 |
| | Property Damage | $1,000,000 |
| **Excess Liability - Umbrella Form** | Each Occurrence | $1,000,000 |
| | Aggregate | $1,000,000 |

Payment and Performance Bonds (if required, as forms attached to the attached) Each shall be 100% of the contract amount

Subcontractor's completed Certificate of Insurance, on the form furnished by Contractor, when accepted by Contractor, shall become Exhibit "B" of this subcontract. Subcontractor shall cause his subcontractors to procure insurance covering the above liabilities under policies in force, and amounts and with insurance companies acceptable to Contractor. Subcontractor will obtain said policies or certificates thereof and deliver them to Contractor, if requested to do so by Contractor. If acceptable insurance is not acquired by Subcontractor, Contractor may acquire the required insurance coverages and charge the expense for such coverages to Subcontractor. Contractor reserves the right to require additional insurance policies, coverages, and/or limits from Subcontractor. Such additional insurance policies, coverages, and/or limits, if any, are outlined on the Certificate of Insurance. All policies of insurance required to be maintained by Subcontractor shall be endorsed to waive the Carrier's right of subrogation against the Contractor and the Owner, and shall include a cross liability clause.

## Article 10.
SUBCONTRACTOR AGREES TO INDEMNIFY CONTRACTOR, AND CORPORATIONS WHICH DIRECTLY OR INDIRECTLY THROUGH ONE OR MORE INTERMEDIARIES CONTROL, OR ARE CONTROLLED BY, OR ARE UNDER COMMON CONTROL WITH, CONTRACTOR, AND THE DIRECTORS, OFFICERS, AGENTS AND EMPLOYEES OF SUCH CORPORATIONS, AGAINST ALL LIABILITY AND CLAIMS FOR DEATH OF OR INJURY TO ANY PERSON, INCLUDING BUT NOT LIMITED TO EMPLOYEES OF SUBCONTRACTOR OR OF ANY INDEMNITEE, OR PROPERTY DAMAGE, INCLUDING THE LOSS OF USE OF PROPERTY, INCLUDING EXPENSES AND ATTORNEYS FEES RELATED THERETO, ARISING OR ALLEGED TO ARISE OUT OF OR IN ANY WAY RELATED TO THIS SUBCONTRACT OR SUBCONTRACTOR'S PERFORMANCE OF THE SUBLET WORK OR OTHER ACTIVITIES OF SUBCONTRACTOR AND HIS AGENTS AND EMPLOYEES ON AND AROUND THE PREMISES ON WHICH THE WORK IS TO BE PERFORMED, ~~EVEN IF SUCH CLAIM OR LIABILITY IS DUE IN WHOLE OR IN PART TO THE NEGLIGENCE OF ANY INDEMNITEE, IT BEING THE EXPRESS INTENT OF THE PARTIES THAT THE SUBCONTRACTOR INDEMNIFY THE CONTRACTOR EVEN FROM THE CONTRACTOR'S OWN NEGLIGENCE.~~ SUBCONTRACTOR ALSO AGREES TO INDEMNIFY CONTRACTOR AND HOLD HIM HARMLESS FROM ALL EXPENSES, INCLUDING ATTORNEYS FEES, CAUSED BY OR RELATED TO ANY BREACH BY SUBCONTRACTOR OF THE COVENANTS CONTAINED IN THIS AGREEMENT. SUBCONTRACTOR'S OBLIGATION TO INDEMNIFY CONTRACTOR AGAINST ANY ATTORNEYS FEES OR OTHER COSTS OR EXPENSES INCURRED BY CONTRACTOR IN CONNECTION WITH THE DEFENSE OF ANY CLAIMS OR CAUSES OF ACTION SHALL BE CONSTRUED AS A SEPARATE ITEM OF INDEMNIFICATION THAT SHALL BE AN ABSOLUTE OBLIGATION OF SUBCONTRACTOR ~~EVEN IF SUCH CLAIMS OR CAUSES OF ACTION ARE INVALID OR GROUNDLESS, OR IF THEY ARISE FROM THE NEGLIGENCE OF CONTRACTOR.~~

## Article 11.
If Contractor so elects and gives Subcontractor written notice of such election, Subcontractor must submit to Contractor for approval all his proposed subcontractors, and Contractor may reject any proposed subcontractor. Approval of a subcontractor will not imply that Contractor assumes any responsibility for such subcontractor or that Subcontractor is relieved of any responsibility with respect to the Sublet Work.

## Article 12.
It is recognized that if Subcontractor is adjudged a bankrupt, or makes a general assignment for the benefit of creditors, or if a receiver is appointed for the benefit of its creditors, or if a receiver is appointed on account of its insolvency, such could impair or frustrate Subcontractor's performance of this Subcontract. Accordingly, it is agreed that upon the occurrence of any such event, Contractor shall be entitled to request of Subcontractor or its successor in interest assurance, satisfactory to Contractor, of future performance in accordance with this Subcontract. Failure to provide such satisfactory assurance within ten (10) days of delivery of the request shall entitle Contractor to

# *EXHIBIT B*

# Commercial Lines Policy
## Common Declarations

GL3365060
**Policy Number**

NEW
**Renewal Number**

**Coverage is provided by:**
  Colony Insurance Company
  9201 Forest Hill Avenue, Suite 200
  Richmond, VA  23235



**Named Insured and Mailing Address:**
XROADS, LP DBA
CROSSROADS LP
2809 N. BEACH
FT. WORTH, TX 76111

AUG 1 0 2005

**Policy Period:**
From ____7-30-05____ to ____7-30-06____ at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** X Individual   ☐ Partnership   ☐ Corporation   ☐ Other _____

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.
This policy consists of the following coverage parts for which a premium is indicated. This premium may be subject to adjustment.

| | | Premium |
|---|---|---|
| Commercial Auto Coverage Part | $ | NOT COVERED |
| Commercial Garage Coverage Part | $ | NOT COVERED |
| Commercial Crime Coverage Part | $ | NOT COVERED |
| Commercial Property Coverage Part | $ | NOT COVERED |
| Commercial General Liability Coverage Part | $ | 17,881.00 |
| Commercial Inland Marine Coverage Part | $ | NOT COVERED |
| Terrorism Risk Insurance Act - Certified Acts Coverage - Covered | $ | NOT COVERED |

KEYED
AUG 1 1 2005
Per _____

POLICY FEE: $200.00
TX PREMIUM TAX: $876.93   STAMPING FEE: $18.08

**Total**   $ 18,976.01

Form(s) and Endorsement(s) made a part of this policy at time of issue*:
  **SEE GE3059 4/00**

*Omit applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.

**Producer Name and Address:**
MORGAN-EAVES AGENCY
716 BROADWAY
PLAINVIEW, TX 79072

LITCHFIELD SPECIAL RISKS INC.
P.O. BOX 13225
EL PASO,T X 79913

#42-22490

**Producer Number:** 94146

Countersigned by _____   Date ____7-29-05/:: F/eg____
            Authorized Representative

These Declarations together with the Common Policy Conditions, Coverage Part Declarations, Coverage Part Coverage Form(s) and Forms and Endorsement, if any, issued to form a part thereof, complete the above numbered policy.

GE 2000 (1-03)        Includes copyrighted material of Insurance Services Office, Inc. with its permission. Copyright, Insurance Services Office, Inc., 1983, 1984.

| **IMPORTANT NOTICE** | **AVISO IMPORTANTE** |
|---|---|

To obtain information or make a complaint:

You may call the company's toll-free telephone number for information or to make a complaint at

**1-800-456-8458**

You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at

**1-800-252-3439**

You may write the Texas Department of Insurance
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**PREMIUM OR CLAIM DISPUTES:** Should you have a dispute concerning your premium or about a claim you should contact the agent or the company first. If the dispute is not resolved, you may contact the Texas Department of Insurance.

**ATTACH THIS NOTICE TO YOUR POLICY:** This notice is for information only and does not become a part or condition of the attached document.

---

Para obtener informacion o para someter una queja:

Usted puede llamar al numero de telefono gratis de la compania para informacion o para someter una queja al

**1-800-456-8458**

Puede comunicarse con el Departamento de Seguros de Texas para obtener informacion acerca de companias, coberturas, derechos o quejas al

**1-800-252-3439**

Puede escribir al Departamento de Seguros de Texas
P.O. Box 149104
Austin, TX 78714-9104
FAX # (512) 475-1771

**DISPUTAS SOBRE PRIMAS 0 RECLAMOS:** Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el agente o la compania primero. Si no se resuelve la disputa, puede entonces comunicarse con el departamento (TDI).

**UNA ESTE AVISO A SU POLIZA:** Este aviso es solo para proposito de informacion y no se convierte en parte o condicion del documento adjunto.

00-AU 7020 TX (9-99)

# FORMS AND ENDORSEMENTS
# EFFECTIVE ON INCEPTION DATE

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**COMMERCIAL AUTO COVERAGE PART**
**COMMERCIAL CRIME COVERAGE PART**
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL UMBRELLA POLICY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

(The following needs to be completed only when this endorsement is issued subsequent to inception of the policy.)

| Named Insured XROADS, LP DBA<br>CROSSROADS LP | | |
|---|---|---|
| Endorsement Effective 07/30/05 | Policy Number    GL3365060 | Countersigned by |

(Authorized Representative)
Litchfield Special Risks, Inc.

The following forms and endorsements are made part of the policy at time of issue and are effective on the inception date of the policy:

| NUMBER | EDITION | NAME |
|---|---|---|
| 00-GE 2101C | (09/00) | COMMERCIAL GENERAL LIABILITY COV. PART SUPPLEMENTAL DECLARAT |
| 00-GE 2101F | (09/00) | CGL  EXTENSION OF DECLARATIONS  (IF APPLICABLE) |
| 00-GE 3059 | (04/00) | FORMS AND ENDORSEMENTS EFFECTIVE ON INCEPTION DATE |
| 00-AU 3933 | (03/03) | NUCLEAR, BIOLOGICAL OR CHEMICAL TERRORISM EXCLUSION (OTHER T |
| 00-GE 3055 | (04/01) | SURPLUS LINES ENDORSEMENT |
| 00-GL 3847 TX | (04/00) | CHANGES TO THE COMMERCIAL GENERAL LIABILITY COVERAGE FORM-TX |
| 00-GL 3848 | (04/01) | MINIMUM EARNED PREMIUM AND PREMIUM AUDIT ENDORSEMENT |
| 00-GL 3877 | (12/03) | EXCLUSION OF CERTIFIED ACTS OF TERRORISM & OTHER ACTS OF TER |
| CG 00 01 | (07/98) | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| CG 00 62 | (12/02) | WAR LIABILITY EXCLUSION |
| CG 21 47 | (07/98) | EMPLOYMENT-RELATED PRACTICES EXCLUSION |
| CG 21 49 | (09/99) | TOTAL POLLUTION EXCLUSION ENDORSEMENT |
| 00-AU 7020 TX | (09/99) | IMPORTANT NOTICE/AVISO IMPORTANTE |
| IL 00 17 | (11/98) | COMMON POLICY CONDITIONS |
| 00-GL 3844 | (04/01) | WARRANTY OF INSURANCE FOR SUBCONTRACTORS - ADD'L POLICY |
| 00-GL 3855 | (04/01) | PENDING SUIT, PRE-EXISTING DAMAGE AND KNOWLEDGE EXCLUSION |
| 00-GL 3856 | (04/01) | PRIOR MANIFESTATION EXCLUSION |
| 00-GL 3868 | (12/01) | SYNTHETIC STUCCO EXCLUSION |
| 00-GL 3869 | (01/02) | NON-RENEWAL CONDITION DELETION ENDORSEMENT |
| 00-GL 3938 | (05/02) | NOTICE TO POLICYHOLDERS RESTRICTIONS OF COVERAGE |
| CG 21 67 | (04/02) | FUNGI OR BACTERIA EXCLUSION |
| CG 2033 | (10/01) | BLANKET ADDITIONAL INSURED |
| PHN5034 | (01/05) | NOTICE TO POLICY HOLDERS |
| 00-GL3896 | (08/04) | CONDITIONAL EXCLUSION OF TERRORISM |

All other terms and conditions of this policy remain unchanged.

00-GE 3059 (4-00)

# F___IS AND ENDORSEMENT
# EFFECTIVE ON INCEPTION DATE

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

**COMMERCIAL AUTO COVERAGE PART**
**COMMERCIAL CRIME COVERAGE PART**
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL UMBRELLA POLICY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

(The following needs to be completed only when this endorsement is issued subsequent to inception of the policy.)

| Named Insured XROADS, LP DBA CROSSROADS LP | | |
|---|---|---|
| Endorsement Effective 07/30/05 | Policy Number   GL3365060 | Countersigned by |

(Authorized Representative)
Litchfield Special Risks, Inc.

The following forms and endorsements are made part of the policy at time of issue and are effective on the inception date of the policy:

| | | |
|---|---|---|
| IL0021 | (04/98) | NUCLEAR ENERGY LIABILITY EXCLUSION |
| PJCG | (04/03) | POLICY JACKET |
| U094 | (07/02) | SERCVICE OF SUIT |
| 00-GE3802 TX | (06/04) | SILICA PARTICLES EXCLUSION |
| 00-GL 3857 | (04/01) | PRIMARY INSURANCE FOR SPECIFIED ADDITIONAL INSURED END |
| CG 02 05 | (01/96) | TEXAS CHANGES – AMENDMENT OF CANCELLATION PROVISIONS OR COVE |
| CG2404 | (10/93) | WAIVER OF TRANSFER OF RIGHTS |
| GE2000 | (01/03) | COMMERCIAL LINES POLICY DECLARATION |

All other terms and conditions of this policy remain unchanged.

00-GE 3059 (4-00)

## Surplus Lines Endorsement

This endorsement which is effective ___07/30/05___, forms a part of Policy No. ___'GL3365060___.
                                                  (12:01 a.m., Standard Time)

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as a surplus line coverage pursuant to the Texas insurance statutes. The State Board of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and this insurer is not a member of the property and casualty insurance guaranty association created under Article 21.28-C, Insurance Code. Article 1.14-2, Insurance Code, requires payment of _4.85_____ percent tax on gross premium.

00-GE 3055 (4-01)

# CHANGES TO THE COMMERCIAL GENERAL LIABILITY COVERAGE FORM - TEXAS

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:
**COMMERCIAL GENERAL LIABILITY COVERAGE FORM – CG 00 01 07 98**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

(The following needs to be completed only when this endorsement is issued subsequent to inception of the policy.)

| Named Insured XROADS, LP DBA CROSSROADS LP | | |
|---|---|---|
| Endorsement Effective 07/30/05 | Policy Number ⁻⁻⁻GL3365060 | Countersigned by |

(Authorized Representative)

Litchfield Special Risks, Inc.

**A.** Exclusion **e.** of **SECTION I – COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** is deleted in its entirety and replaced by:

**e. Employer's Liability With No Exception for Liability Assumed Under An "Insured Contract"**
"Bodily injury" to:
**(1)** An "employee" of the insured arising out of and in the course of:
 **(a)** Employment by the insured; or
 **(b)** Performing duties related to the conduct of the insured's business; or
**(2)** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **(1)** above.
This exclusion applies:
**(1)** Whether the insured may be liable as an employer or in any other capacity; and
**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusions are added to paragraph **2. Exclusions** of **SECTION I – COVERAGE A  BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and paragraph **2. Exclusions** of **SECTION I – COVERAGE B  PERSONAL AND ADVERTISING INJURY LIABILITY:**

This insurance does not apply to:

**1. Communicable Disease/Sexual Action/Abuse**
 **(a)** Any claim, "suit", accusation or charge brought by or against any insured including "employees" of any insured for the actual or alleged transmission of a communicable disease by any insured or "employee" of any insured including, but not limited to, Human Immunodeficiency Virus (HIV), Acquired Immune Deficiency Syndrome (AIDS) or hepatitis;
 **(b)** Any claim, "suit", accusation or charge brought by or against any insured including "employees" of any insured for the actual or alleged failure to perform services which were either intended to or assumed to prevent communicable diseases or their transmission to others;
 **(c)** Any claim, "suit", accusation or charge brought by or against any insured including "employees" of any insured for actual or alleged sexual action. Sexual action includes, but is not limited to, any verbal or nonverbal communication, behavior or conduct with sexual connotation or purpose, whether for sexual gratification, discrimination, intimidation, coercion or other reason, and regardless of whether such action is alleged to be intentional or negligent;
 **(d)** Any claim, "suit", accusation or charge brought by or against any insured including "employees" of any insured for actual or alleged abuse. Abuse includes, but is not limited to, the negligent or intentional infliction of physical, emotional or psychological injury or harm to any person; or
 **(e)** Any claim, "suit", accusation or charge brought by or against any insured including "employees" of any insured for negligent hiring, placement, training or supervision arising from, actual or alleged, sexual action, abuse or the transmission of a communicable disease.

**2. Professional Services**
"Bodily injury", "property damage", or "personal and advertising injury" due to the rendering of or failure to render any professional service.

**3. Asbestos**

**(a)** "Bodily injury", "property damage", or "personal and advertising injury" arising out of, or which would not have occurred in whole or in part but for:

**(1)** Inhaling, ingesting or prolonged physical exposure to asbestos in any form, or goods or products containing asbestos in any form, at any time, anywhere, in any way;

**(2)** The use of asbestos in any form in construction, or in the manufacturing of any goods, products or man-made structures, objects or features;

**(3)** The removal of asbestos in any form from any goods, products or man-made structures, objects or features; or

**(4)** The manufacture, transportation, storage, service, installation, use, sale, mining, distribution or disposal of asbestos in any form, or goods or products containing asbestos in any form.

**(b)** Any loss, cost, expense, fines or penalties related to or arising out of any of the above, including but not limited to:

**(1)** The investigation of any claim or defense of any "suit" for injury or damage;

**(2)** Any request or demand, including but not limited to an order or statutory or regulatory requirement issued or made pursuant to any environmental protection or environmental liability statutes or regulations, that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of asbestos in any form; or

**(3)** Any claim or "suit", including but not limited to those by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of asbestos in any form.

**5. Lead**

**(a)** "Bodily injury", "property damage", or "personal and advertising injury" arising out of, or which would not have occurred in whole or in part but for:

**(1)** The actual, alleged or threatened ingestion, inhalation, consumption, absorption, discharge, dispersal, seepage, migration, release or escape of lead in any form, at any time, anywhere, in any way;

**(2)** The use of lead in any form, or products containing lead or the residue of lead, in construction or manufacturing of any goods, products or man-made structures, objects or features;

**(3)** The removal of lead in any form from any goods, products or man-made structures, objects or features; or

**(4)** The manufacture, transportation, storage, service, installation, use, sale, mining, distribution or disposal of lead in any form, or goods, products or man-made structures, objects or features containing lead or the residue of lead.

**(b)** Any loss, cost, expense, fines or penalties related to or arising out of any of the above, including but not limited to:

**(1)** The investigation of any claim or defense of any "suit" for injury or damage;

**(2)** Any request or demand, including but not limited to an order or statutory or regulatory requirement issued or made pursuant to any environmental protection or environmental liability statutes or regulations, that any insured or others test for, monitor, clean up, remedy, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of lead in any form; or

**(3)** Any claim or "suit", including but not limited to those by or on behalf of a governmental authority, for damages because of testing for, monitoring, cleaning up, remedying, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of lead in any form.

**C.** The following is added to definition **9.** "Insured contract" in **SECTION V – DEFINITIONS:**

**9.** An "insured contract" does not include that part of any contract or agreement that indemnifies any person or organization for "bodily injury", "property damage", or "personal and advertising injury" arising from an "occurrence" caused by the sole negligence of said person or organization.

All other terms and conditions of this policy remain unchanged.

00-GL 3847 TX (4-00)

# MINIMUM EARNED PREMIUM AND PREMIUM AUDIT ENDORSEMENT

**This endorsement changes the policy. Please read it carefully.**

This endorsement modifies insurance provided under the following:
**COMMON POLICY CONDITIONS**
**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:
(The following needs to be completed only when this endorsement is issued subsequent to inception of the policy.)

| Named Insured XROADS, LP DBA CROSSROADS LP | | |
|---|---|---|
| Endorsement Effective 07/30/05 | Policy Number GL3365060 | Countersigned by |

(Authorized Representative)
Litchfield Special Risks, Inc.

**A.** Item **5.** of section **A. CANCELLATION** of the **Common Policy Conditions** is replaced by the following:

    **5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

      **a.** If we cancel, the refund will be pro rata.

      **b.** Cancellation at the request of the first Named Insured:
This policy is subject to a Minimum Earned Premium which is 25% of the premium for this policy as shown in the applicable Coverage Part(s) Declarations unless scheduled here otherwise: _____%. This Minimum Earned Premium is the least amount of premium we shall retain as earned premium, regardless of the term. If the first Named Insured cancels, the refund will be determined as follows:

        **(1)** If at the time of cancellation the earned premium is greater than the Minimum Earned Premium, the refund will be 90% of the pro rata return.

        **(2)** If at the time of cancellation the earned premium is equal to or less than the Minimum Earned Premium, the refund will be the premium paid in excess of the Minimum Earned Premium.

    Cancellation for non-payment of premium will be considered cancellation at the request of the first Named Insured.

**B.** If this policy is subject to premium audit, paragraph **b.** of item **5. Premium Audit** in **SECTION IV-COMMERCIAL GENERAL LIABILITY CONDITIONS** of the **COMMERCIAL GENERAL LIABILITY COVERAGE FORM** is replaced by the following:

    **b.** Premium shown in the **Commercial General Liability Coverage Part Supplemental Declarations** as Advance Premium is a deposit premium only which will be credited toward the amount of earned premium. The Advance Premium is the minimum premium for the policy period, is payable in full at the inception of coverage and is not refundable. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured.

All other terms and conditions of this policy remain unchanged.

00-GL 3848 (4-01)

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND OTHER ACTS OF TERRORISM

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below:

(The following needs to be completed only when this endorsement is issued subsequent to inception of the policy.)

| Named Insured XROADS, LP DBA CROSSROADS LP | | |
|---|---|---|
| Endorsement Effective 07/30/05 | Policy Number `GL3365060` | Countersigned by |

(Authorized Representative)
Litchfield Special Risks, Inc.

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism" or an "other act of terrorism".

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "personal injury", "advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002.  The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

   **a.** The act resulted in aggregate losses in excess of $5 million; and

   **b.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of and effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002.

**C.** In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

All other terms and conditions of this policy remain unchanged.

00-GL 3877 (12-03)                         Includes copyrighted material of Insurance Services Office, Inc., with its permission.